AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
JUL 0 9 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Galaxy Note 8
Model #SM-N95OU; FCC ID #A3LSMN950U
IMEI #351823091398057

Case No. **19MJ10008**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine and Heroin |

The application is based on these facts:

See attached affidavit of HSI Special Agent Matthew Oxendine.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Oxendine, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/9/19

_____
*Judge's signature*

City and state: San Diego, California

Ruth Bermudez Montenegro, US Magistrate Judge
*Printed name and title*

# ATTACHMENT A
## PROPERTY TO BE SEARCHED

The following property is to be searched:

>Galaxy Note 8
>Model #SM-N95OU
>FCC ID #A3LSMN950U
>IMEI #351823091398057
>("**Target Device**")

The **Target Device** is currently stored at the ASAC Calexico Evidence Vault, 2051 North Waterman Avenue, Suite 100, El Centro, California 92243.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data for the period of December 16, 2018 through March 16, 2019.

a. tending to identify attempts to import methamphetamine, heroin or some other federally controlled substance from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, heroin or some other federally controlled substance from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, heroin or some other federally controlled substance from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, heroin or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, §§ 952 and 960.

Case 2:19-mj-10008-RBM   Document 1   Filed 07/09/19   PageID.4   Page 4 of 12



# AFFIDAVIT

I, Special Agent Matthew Oxendine, being duly sworn, hereby state as follows:

1. This affidavit supports an application for a warrant to search the following:

   a. Galaxy Note 8
      Model #SM-N95OU
      FCC ID #A3LSMN950U
      IMEI #351823091398057
      ("**Target Device**")

as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960 – Importation of Controlled Substances. This search supports an investigation and prosecution of Justin STROUD and Kristen Renee SCHMITT for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on March 16, 2019, at the Andrade Port of Entry in Imperial County, California. The **Target Device** was seized from SCHMITT pursuant to her arrest for importation of federally controlled substances. The **Target Device** is currently stored as evidence at the ASAC Calexico Evidence Vault, 2051 North Waterman Avenue, Suite 100, El Centro, California 92243.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

1

## EXPERIENCE AND TRAINING

5. I am employed as a Special Agent (SA) with United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been since August 2016. In May 2017, I completed a twenty-two week training program held at the Federal Law Enforcement Training Center in Glynco, Georgia. Since February 2018, I have been assigned to the HSI Columbus, Ohio office. Prior to this assignment, I was assigned to the Yuma, Arizona office from May to February 2017. Prior to becoming a Special Agent, I served as a uniformed officer with the Yuma Police Department from 2009 to 2016.

6. I have participated in narcotics, bulk cash smuggling, alien smuggling, firearms, and child exploitation investigations that include: controlling informants, conducting defendant and witness interviews, conducting surveillance, and preparing and serving search and arrest warrants. I am familiar with narcotics traffickers' methods of operation, including the importation, distribution, and transportation of illegal drugs, the collection of money, and money laundering. I am also familiar with various counter-surveillance methods utilized by narcotics traffickers.

7. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations. I have become familiar with the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. Based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

8.     Moreover, I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I have learned that professional narcotics operations depend upon maintaining their extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also have learned that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

  a.  Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

  b.  Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

  c.  Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

  d.  Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

  e.  Drug smugglers will use cellular/mobile telephones to notify or warn their

3

accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f.    Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g.    The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

    10.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

    11.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

    a.    tending to identify attempts to import methamphetamine, heroin or some other federally controlled substance from Mexico into the United States;

4

    b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, heroin or some other federally controlled substance from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, heroin or some other federally controlled substance from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, heroin or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

12. On March 16, 2019 at approximately 7:40 a.m., Customs and Border Protection Officer (CBPO) J. Katalbas was assigned to vehicle inspection lane number 2 at the Andrade Port of Entry in Winterhaven, California. At that time, a silver 2009 Toyota Tacoma bearing Arizona license plate AZV0851, approached his location. The driver of the Toyota was identified as Justin STROUD, a United States Citizen. The passenger of the vehicle was identified as Kristen Renee SCHMITT, also a United States Citizen. CBPO Katablas received negative customs declarations from both SCHMITT and STROUD. STROUD provided CBPO Katablas with his Arizona driver's license, and SCHMITT stated she did not have identification. CBPO Katablas referred the vehicle to secondary inspection.

13. In secondary inspection, CBPO Hinojoza conducted a pat down on SCHMITT and discovered a black plastic package concealed in her pelvic area and a bag of white pills concealed in her bra. A sample of a white crystal-like substance taken

from the black package tested positive for methamphetamine. The total weight of the methamphetamine was 34.9 grams. CBPOs identified the white pills as Xanax.

14. A Canine Enforcement Officer (CEO) assigned to the vehicle secondary inspection area utilized his Human/Narcotics Detection Dog (HNDD) to perform a search of the Toyota. The CEO advised officers that his HNDD had a positive alert to the rear seat of the Toyota. CEO Avery and CBPO Williams continued a physical search of the vehicle and discovered 83 vacuum-sealed packages under the rear seat, within the spare tire, and in the windshield reservoir area of the Toyota. One package, labeled "Negro Solo" was found in the speaker box of the Toyota.

15. The brown powdery substance taken from the package found in the speaker box tested positive for heroin. The total weight of the package containing heroin was 1.42 kilograms (3.13 pounds). The white, crystal-like substances tested positive for methamphetamine. The weight of the packages containing methamphetamine totaled 44.08 kilograms (97.18 pounds).

16. At approximately 1:03 p.m., agents initiated a post-arrest interview of STROUD, who waived his *Miranda* rights and agreed to speak with them. STROUD stated that the Toyota belonged to his mother in-law, and that he and SCHMITT traveled to Los Algodones, Baja California, Mexico on March 12 around 7:00 p.m. to get prescription medication. STROUD stated he takes prescription drugs for injuries to his vertebrae and for anxiety. In Los Algodones, STROUD and SCHMITT met a man named "Ramses," for whom they agreed to transport narcotics from Mexico into the United States. STROUD stated they were originally going to be paid $9,000 to transport the narcotics, but were later promised an additional $11,000.

17. The **Target Device** was discovered and seized from SCHMITT at the time of her arrest. HSI assumed custody of the **Target Device**.

18. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that SCHMITT likely used the **Target Device** to coordinate the importation of federally controlled substances into the United

6

1  States. In addition, I believe that recent calls made and received, telephone numbers,
2  contact names, electronic mail (e-mail) addresses, appointment dates, text messages,
3  pictures and other digital information may be stored in the memory of the **Target**
4  **Device** which may identify other persons involved in narcotics trafficking activities.
5  Accordingly, based upon my experience and training, consultation with other law
6  enforcement officers experienced in narcotics trafficking investigations, and all the
7  facts and opinions set forth in this affidavit, I believe that information relevant to the
8  narcotics smuggling activities of SCHMITT, such as telephone numbers, made and
9  received calls, contact names, electronic mail (e-mail) addresses, appointment dates,
10  messages, pictures, and other digital information may be stored in the memory of the
11  **Target Device**.

12  19.  Finally, I also have learned that narcotics trafficking activities entail
13  intricate planning to successfully evade detection by law enforcement. In my
14  professional training, education and experience, I have learned that this requires
15  planning and coordination in the days, weeks, and often months prior to the event.
16  Given this, I request permission to search the **Target Device** for items listed in
17  Attachment B beginning on December 16, 2018, up to and including March 16, 2019.

## METHODOLOGY

19  20.  It is not possible to determine, merely by knowing the cellular telephone's
20  make, model and serial number, the nature and types of services to which the device is
21  subscribed, and the nature of the data stored on the device. Cellular devices today can
22  be simple cellular telephones and text message devices, can include cameras, can serve
23  as personal digital assistants and have functions such as calendars and full address
24  books and can be mini-computers allowing for electronic mail services, web services
25  and rudimentary word processing. An increasing number of cellular service providers
26  now allow for their subscribers to access their device over the internet and remotely
27  destroy all of the data contained on the device. For that reason, the device may only be
28  powered in a secure environment or, if possible, started in "flight mode" or "airplane

7

mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard-drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

23. Based on all of the facts and circumstances described above, there is probable cause to conclude that SCHMITT used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

24. Because the **Target Device** was promptly seized during the investigation of SCHMITT's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by SCHMITT continues

8

to exist on the **Target Device**. As stated above, I believe that the date range for this search is from December 16, 2018 through March 16, 2019.

25. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Matthew Oxendine
HSI Special Agent

Subscribed and sworn to before me this ___9th___ day of July, 2019.

_____
HON. RUTH BERMUDEZ MONTENEGRO
United States Magistrate Judge

9